IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUDY ELLIOTT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-491 |
| | § | |
| LINDA S. McMAHON[1], | § | |
| ACTING COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary

Judgment, and Brief in Support (Document No. 26), and Defendant's Response to Plaintiff's Motion

for Summary Judgment and Motion for Summary Judgment (Document No. 27). Having considered

the cross motions for summary judgment, the administrative record, and the applicable law, the

Magistrate Judge ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary

_____

[1] On January 20, 2007, Linda S. McMahon became the Acting Commissioner of the Social
Security Administration. As such, she is substituted for Commissioner Jo Anne B. Barnhart as
defendant in this suit.

[2] The parties consented to proceed before the undersigned Magistrate Judge on July 24, 2006.
(Document No. 14).

Judgment (Document No. 26) is DENIED, Defendant's Motion for Summary Judgment (Document No. 27) is GRANTED, and the decision of the Commissioner is AFFIRMED.

## I. Introduction

Plaintiff Judy Elliott ("Elliott") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for supplemental security income ("SSI").  Elliott argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Earl W. Crump, committed errors of law when he found that Elliott retained the residual functional capacity ("RFC") for a wide range of light work.  In particular, the ALJ found that physically, Elliott could lift up to ten pounds frequently and 20 pounds occasionally, and could sit, stand, and walk at least six hours each in a normal workday. Mentally, the ALJ found that Elliott would need to avoid tasks that require sustained concentration, persistence, and pace for prolonged periods. (Tr. 22, 23).  The ALJ further found that while Elliott could not perform any of her past relevant work, she nonetheless could perform work as a final assembler, final inspector, and laminator II, and that she was therefore, not disabled.   Elliott contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision.  According to Elliott, the ALJ  erred by failing to properly evaluate the limiting effects of depression on her ability to work. Elliott  moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claims for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Elliott was not disabled

as a result of her impairments, the decision comports with applicable law, and that it should therefore be affirmed.

## II.  Administrative Proceedings

Elliott applied for SSI benefits on September 26, 2003, claiming that she has been unable to work since November 1, 2002, due to high blood pressure, diabetes, a heart murmur, a mass in her right breast and depression. (Tr. 62-64).  The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 26-38).  After that, Elliott requested a hearing before an ALJ. (Tr. 39-43).  The Social Security Administration granted her request (Tr. 44-45) and the ALJ held a hearing on June 8, 2005, at which Elliott's claims were considered *de novo*.  (Tr. 414-445). On June 21, 2005, the ALJ issued his decision finding Elliott  not disabled.  (Tr. 18-24).  The ALJ found that Elliott had not engaged in substantial gainful activity since the alleged onset of disability. At steps two and three, he found that Elliott has depression, diabetes, and high blood pressure, all of which are severe impairments within the meaning of the Act, but that these impairments did not meet or equal the requirements of a listed impairment.  At step four, the ALJ concluded that Elliott's testimony was not fully credible.  He further concluded that Elliott had the residual functional capacity ("RFC") for wide range of  light work.  The ALJ found that Elliott could lift up to 10 pounds frequently and 20 pounds occasionally, and could sit, stand, and walk at least six hours in a normal workday but would need to avoid tasks that require sustained concentration, persistence and pace for prolonged periods.  Also, the ALJ found that Elliott could not return to her past relevant work.  At step five, based on Elliott's RFC, and the testimony of Karen Nielsen, Ph.D., a vocational expert, the ALJ using the Medical-Vocational Guidelines as a framework, *see* Appendix 2, Subpart P, Social Security Regulations No. 4, Rule 202.21,  concluded Elliott was not disabled because she

could perform a restricted range of light work, including jobs such as a final assembler, final inspector and laminator II, all of which are jobs that exist in significant numbers in the regional and national economy, and that she was, therefore, not disabled within the meaning of the Act.

Elliott then asked for a review by the Appeals Council of the ALJ's adverse decision.  (Tr. 12-14).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. §§ 404.970, 416.1470.  After considering Elliott's contentions, including the Attorney's brief dated October 11, 2003, (Tr. 9, 405-413), in light of the applicable regulations and evidence, the Appeals Council concluded, on December 13, 2006, that there was no basis upon which to grant Elliott's request for review.  (Tr. 6-8).  The ALJ's findings and decision thus became final.  Elliott has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  Both Elliott and the Commissioner have filed Motions for Summary Judgment (Document Nos. 26 & 27).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 445 (Document No. 8).  There is no dispute as to the facts contained therein.

**III.  Standard for Review of Agency Decision**

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony,* 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If  the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found that Elliott, despite her impairments and limitations, could perform a wide range of light work restricted only to the extent that she should avoid tasks that require sustained concentration, persistence, and pace for prolonged periods.  The ALJ further found that even though she could not perform her past relevant work, she could however, perform other jobs such as a final assembler, final inspector, and laminator II, and that she therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Elliott had complained of and had been treated for depression, a heart murmur, a mass in her right breast, diabetes, and high blood pressure.

With respect to a heart murmur, the records show that a heart murmur was detected during a routine examination of Elliott. (Tr. 294). On July 9, 2003, Elliott underwent cardiac testing. The echocardiography report showed that the size of the right ventricle was normal and had normal RV function. In addition, the atrial septum, right atrium, aorta, and pericardium were all normal in size. In contrast, her "left ventricle is mildly enlarged. LV function is normal. Overall wall motion is normal. Normal septal motion. Qualitative EF is 60-65 %." Also, Elliott's left atrium was mildly enlarged. The aortic valve, mitral valve, and tricuspid valve were all found to have a normal structure and motion. Doppler findings showed that Elliott's "mitral inflow velocity is consistent with normal LV filling pressure. Evidence by Doppler of normal LV relaxation." (Tr. 287).

The medical records further show that a right breast mass was detected in Elliott's right breast. The results of Elliott's September 3, 2003, bilateral screening mammogram were normal. (Tr. 268). The results of the mammogram that was taken a year later on October 27, 2004, revealed a "1 cm oval questionably centrally lucent mass with a circumscribed margin in the right breast at 3 o'clock in the middle depth. Compared to previous films, this mass is new." (Tr. 339, 372). Based on the change, the radiologist opined: "[a]dditional imaging evaluation recommended. The mass in the right breast appears not readily classifiable as benign or malignant." (Id.) Elliott had a follow-up mammogram on December 21, 2004, which showed a "8 mm oval mass with 9 circumscribed mag in the right breast at 5 o'clock in the posterior depth." (Tr. 337, 376). Because of the increase in the size of the mass, the radiologist recommended that Elliott undergo an ultrasound of the right breast. The ultrasound was performed on February 7, 2005. (Tr. 374). No mass was visible on the ultrasound. (Id.). A follow-up mammogram was performed on March 30, 2005. (Tr.

392).  Again, the image showed a mass of the same size with a low suspicion of malignancy.  Given this finding, it was recommended that Elliott have a needle biopsy.  (Tr. 392).

Also, the medical records show that Elliott has been treated for type II diabetes.  On January 2, 2003, Elliott's fasting glucose was high.  (Tr. 290).  At her appointment a month later on February 16, 2003, the doctor wrote "Pt needs better control.  Will [increase] [Metformin]."  (Tr. 267).  With the increased dosage of Metformin, Elliott had "improved control" of her type 2 diabetes at her September 18, 2003, appointment.  (Tr. 262).  Elliott reported feeling well at her routine follow-up appointment on November 6, 2003.  (Tr. 258).  Again, on December 17, 2003, Elliott's diabetes was described as "well controlled."  (TR. 255).  In addition, the records show that Elliott had her medications routinely refilled and that she was compliant with her follow-up examinations.  Because of diabetes, she had a foot examination for diabetics on October 8, 2004, which revealed anchomycosiz and cavns foot type. (Tr. 341).  Because she is a diabetic, Elliott was warned to watch her weight at her March 28, 2005, appointment.  (Tr. 396).   On May 12, 2005, Elliott's fasting glucose was 69, within normal limits, and her weight had improved.  (Tr. 379).

Also, the medical records show that Elliott has hypertension.  For instance, in November 2002, Elliot's blood pressure reading was 150/90.  (Tr. 306-301).  On December 10, 2002, when Elliott was treated for burns to her leg, her blood pressure was 143/81.  (Tr. 295).  A treatment note of August 21, 2003, states:  "HTN-not well controlled."  (Tr. 280).  Again, Elliott's blood pressure reading was high on August 30, 2003.  For example, she had a reading of 146/101 (Tr. 272). Thereafter, Elliott was prescribed a different blood pressure medication for better control.  Following the change in medication, Elliott's blood pressure was controlled by medication.  For instance, at Elliott's September 18, 2003, appointment, her blood pressure was "well controlled."  (Tr. 262). Again, on November 6, 2003, Elliott's blood pressure was 137/73.  (Tr. 258).  At her next

appointment on December 17, 2003, Elliott's blood pressure was 116/67 and was described as "well controlled." (Tr. 255). On January 8, 2004, Elliot went to the emergency room complaining of depression. Blood pressure readings taken during her hospital stay were 140/84, (Tr. 244), and 142/81. (Tr. 246). Elliott returned for a follow-up appointment on June 3, 2004. Her blood pressure was recorded as 121/67. (Tr. 232). Elliott's blood pressure was 140/80 on August 2, 2004 (Tr. 357), 134/80 on September 2, 2004 (Tr. 342), and 140/74 on October 8, 2004. (Tr. 341). However, at her March 28, 2005, appointment Elliott reported being off her medication for a week and her blood pressure was 182/75. On May 12, 2005, back on her medication, Elliott's blood pressure was again described as "improved" and she had a reading of 134/63. (Tr. 379).

The medical records show that Elliott was hospitalized at Ben Taub Hospital from June 23 to June 27, 2004, for cholelithiasis. (Tr. 128-169). In addition, the medical records show that Elliott was treated for burns to her right lower leg on December 10, 2003. (Tr. 295). With respect to her vision, Elliott was seen at the eye clinic on June 23, 2004 (Tr. 358), and she was treated at the Mann Eye Institute. (Tr. 402-404).

In connection with her application for SSI benefits, Elliott underwent a consultative physical examination by Alan E. Cororve, M.D., on April 13, 2004. (Tr. 184-187). Elliott reported to Dr. Cororve that "she tests her blood sugars three times a day, and the fasting blood sugars average 150 mg. %, seven hours later they average 120 mg. %, and seven hours later 130 mg. %. She does not know if her doctor is satisfied with her diabetic control, and she does not know if any organs have been affected by her diabetes. Hypertension was diagnosed in November 2002, she says she checks her blood pressure at home, and states they are frequently "300/200+ mm of mercury." (Tr. 184). In connection with his evaluation of Elliott, Dr. Cororve conducted a physical examination, the findings of which are as follows:

Weight 228 lbs, height 71 inches, temperature 98.5, blood pressure 140/90, pulse 80, and respirations 16. HEENT: unremarkable except cerumen in the left canal. The carotids were full and equal without bruits or thrills, and the thyroid was of normal size without evidence of modularity. The lung fields were clear, and cardiac examination revealed normal sounds and there was a grade 2/6 systolic ejection murmur at the lower left sternal border and the apex. The abdomen was rounded, soft, and non-tender without evidence of organomegaly or masses. The breasts were pendulous. The bicep, tricep, brachioradialis, patellar, and ankle reflexes were depressed. The femoral, posterior tibial, and dorsalis pedis pulses were normal bilaterally. She had full range of motion of all joints examined in the upper and lower extremities using active and passive exercises. Muscular strength was normal and equal in all muscles tested in the upper and lower extremities. Handgrip was 4/4 bilaterally. The patient walked with a steady gait and did not demonstrate any limp.

Ms. Elliott's diabetes mellitus is not well controlled by the testing she related to me. Her hypertension is apparently not well controlled, and I certainly doubt the accuracy of the readings she is telling me about at home. Her anemia is undiagnosed. (Tr. 185).

In addition, a DDS physician completed a Residual Functional Capacity Assessment-Physical on May 3, 2004. (Tr. 202-209). According to the assessment, Elliott had no postural, manipulative, visual, communicative, and environmental limitations, and could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, could stand and/or walk and sit about 6 hours in an 8 hour workday, and could push/pull without limitation. (*Id*.).

The majority of medical records relate to Elliott's treatment for depression. On November 24, 2003, Elliott underwent a consultative evaluation by Amina Abdulla, M.D. (Tr. 171-177). Dr. Abdulla diagnosed Elliott with major depressive disorder, recurrent moderate. With respect to this diagnosis at Axis I, Dr. Abdulla wrote:

The patient is depressed, has crying spells, has decreased energy, decreased interest, feels helpless, hopeless, and worthless as she cannot function and cannot support her family In fact, she stated, her 19-year-old is going to UT Austin and is in second year and wants to give up school to come and help her. At this point, she became very tearful as she stated, "my son is worried and I don't want him to leave college." The patient isolates herself, does not do much at home, but has a supportive cousin who lives with her, and the patient has a supportive daughter. Thus, the patient has impairment in social, occupational, and important areas of functioning. (Tr.174).

Also, Dr. Abdulla assigned to Elliott a Global Assessment Functioning ("GAF") of 45.[3]  (Tr.174).

As to Elliott's prognosis, Dr. Abdulla wrote:

> Guarded to poor.  This patient who has worked most her life, raised her children, describing herself as happy-go-lucky, involved in church, volunteering in her children's school, became depressed about two years ago.  She also has got a lot of medical problems and now feels depressed, tired, and not interested in the surroundings or participating in any events or any family gatherings.  She does not want to go out shopping.  (Tr. 174-175).

In addition to the consultative evaluation by Dr. Abdulla, Elliott was referred to Theodore Pearlman, M.D., for an evaluation, which was performed on April 12, 2004. (Tr. 180-183)  The results of Dr. Pearlman's evaluation reveal:

> Telltale evidence of factitious disorder with psychological symptoms is evident in the approximate answers to simple questions on information.  There is discrepancy between Ms. Elliott's description of constant tearfulness and her presentation at this examination indicative of neutral affect.

> There is no reason to suspect, based upon this examination, that Ms. Elliott has difficulties with reasoning and making occupational, personal, and social adjustments if she choose to do so.  Ms. Elliott describes severe constriction of social interest, which appears discrepant with her interaction during the course of the interview.  No psychotic thought processes are evident.  (Tr. 182).

Based on his evaluation of Elliott, Dr. Pearlman opined at Axis I that Elliott had factitious disorder with psychological symptoms.  In addition, he assigned to Elliott a GAF score of "80 (if Ms. Elliot chooses to adapt appropriately to ordinary life stressors.")  (Tr. 182).[4]

---

[3] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning."  *Boyd v. Apfel*, 293 F.3d 698, 708 (5th Cir. 2001) (citing *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM-IV), at 32).  A GAF of 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends or unable to keep a job.")

[4] A GAF of 71-80 denotes "if symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork).  *See Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM-IV),

A DDS physician completed a Psychiatric Review Technique Form on April 30, 2004.  (Tr. 188-201).  According to the form, the doctor opined that Elliott had "MDD, Recurrent, Moderate."  Also, the physician evaluated Elliott's functional limitations in light of this diagnosis, and applying a rating scale of none, mild, moderate, marked or extreme.  According to the form, Elliott had no functional limitations with respect to difficulties in maintaining concentration, persistence or pace, episodes of decompensation, each of extended duration, and had "mild" limitations  as to her restrictions of daily living and difficulties in maintaining social functioning.  Overall, the physician concluded that Elliott retained the "capability to understand, follow and carry out detained, non-complex tasks and instructions, get along with others and adapt to ordinary changes."  (Tr. 200).

According to the medical records, Elliott started taking Lexapro, an anti-depressant in 2003.  (Tr. 267).  Even though she had been prescribed an anti-depressant, at Elliott's November 16, 2003, appointment she stated that "she has been prescribed antidepressant at [Ben Taub] but doesn't take them. [Elliott] does not feel she's depressed.  "Just stressed" not working and son in trouble."  (Tr. 258).   Elliott went to Ben Taub Hospital on January 8, 2004, complaining of depression.  Elliott described herself as having "restlessness." (Tr. 251).  According to the hospital note, Elliott was fine physically. (Tr. 247-250).  Mentally, Elliott had no perceptual disturbances, her speech was normal, her thought content was appropriate, and her mood was "fair." (Tr. 249).  Elliott reported becoming depressed after being diagnosed with diabetes.  (Tr. 249).  Elliott had a GAF score of 50.

Elliott subsequently was referred by Ben Taub Hospital to MHMRA of Harris County for clinical services.  On January 12, 2004, Elliott underwent an evaluation for eligibility for adult services.  (Tr. 221-230).  According to the evaluation, Elliott had gone to Ben Taub Hospital on January 8, 2004, seeking medical attention because she could not stop crying and was unable to

at 34.

sleep.  Elliott reported that her medication (Lexapro) was increased from 10 mg to 20 mg and she

noted a difference.  As part of the eligibility process, Elliott underwent a mental status examination.

(Tr. 228-229). Elliott had a normal tone and volume of speech, her mood was normal and pleasant,

and her affect was appropriate.  She denied any suicidal or homicidal ideas.  Her insight and

judgment were good, her thought process was logical, and her thought content was non-delusional.

Elliott was oriented as to person, place, time and situation.  Elliott had above average intellectual

functioning and she was alert and clear.  Elliott had a preliminary GAF of 60.[5]  (Tr. 229).

On February 4, 2004, Elliott's treating physician, Dr. Sadre completed a form entitled "AMH

Psychiatric Assessment".  (Tr. 214-220).  The results of Elliott's mental status examination show

that she was cooperative, her motor activity and speech were within normal limits, her mood and

affect was mildly depressed, her thought form was coherent and good, she was alert, and her

judgment and insight were fair.  Dr. Sadre wrote:

> 45 [year old] divorced [black female] [complaining history of] multiple medical
> problems and depression.  Recently [ ] [complaining of] depression.  Was started on
> Lexapro 10 mg.  Did respond to [medication] after dosage [increased] to 20 mg.
> [Patient] multiple medical conditions and taking several different meds.  Currently
> doing better.  Feeling less depressed.  [Complaining of [decreased] energy.  Fatigue.
> [Decreased] motivation.  Denies [ ]  No evidence of [ ].  [Patient] has been
> unemployed since 1999, receives child support money/food stamps.  Has good
> relationship [with] her 2 older children, no contact [with] her family.  It appears that
> she has developed [ ] weight to her problem [and] will comply [with] her
> [medication.].  [Patient] has no [history of] alcohol, substance abuse.  (Tr. 217).

Elliott had a GAF of 52.  (Tr. 218).

At her May 24, 2004, follow-up visit, Elliott reported taking  her medication as prescribed

and further reported sleeping well.  (Tr. 211).  According to the June 3, 2004, treatment note, Elliot's

---

[5] A GAF of 51-60 denotes "moderate symptoms (e.g, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers."). *See Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM-IV), at 34.

depression was "stable." (Tr. 232). Elliott reported that she was exercising and looking for a job. (*Id*.). Likewise, at her August 11, 2004, appointment, Elliott reported doing well on her medications and was sleeping about five hours. Elliott stated that she was feeling "mildly depressed." (Tr. 334). The results of the mental status examination revealed that Elliott was cooperative, her mood and affect was mildly depressed, her motor activity and speech were within normal limits, her thought process was coherent, her insight and judgment was fair and she was alert. (Tr. 334). Elliott's condition was unchanged at her October 27, 2004, appointment. (Tr. 330-332). Elliott participated in a psychotherapy session on November 3, 2004, and reported feelings of hopelessness and unloveability. (Tr. 329). Elliott was seen again by Dr. Sadre on January 19, 2005. (Tr. 324). Elliott reported taking her medication regularly and she  had no problems sleeping or eating.  Dr. Sadre opined that Elliott's condition was "stable." (Tr. 324).  In addition, on this same date, Dr. Sadre completed a form entitled "Physician's Statement Verifying Eligibility for Disability Homestead Exemption." (Tr. 398-400). Dr. Sadre wrote:  "major depression; single episode severe without psychotic feature.  Her condition is characterized by crying spells, poor sleep, appetite, motivation, and depression".  The evaluation included five Axis DSM diagnosis.  At Axis 1, Elliott was diagnosed with major depressive disorder, single episode without psychotic feature.  At Axis II, there was no diagnosis.  Axis III:  diabetes mellitus type 2, hypertension, hypercholesterolemia.  At Axis IV:  economic problems, problems with primary support group, other psychosocial and environ, and occupational problems.  Elliott had a GAF of 60.  (Tr. 399).

Here, substantial evidence supports the ALJ's finding that none of Elliott's impairments (depression, diabetes, and high blood pressure) met or equaled a listed impairment.  The medical records show that both Elliott's diabetes and hypertension were well controlled by medication. Moreover, there was no evidence of end organ damage, cardiac problems or systemic complications

related to either diabetes or hypertension.  As to depression, substantial evidence supports the ALJ's finding that Elliott's depression did not meet or equal Listing 12.00 because there was no marked restrictions in Elliott's ability to perform activities of daily living, maintain social functioning, or in her ability to concentrate, persist or remain on task.  Also, substantial evidence supports the ALJ's findings that neither the right breast mass or heart murmur were severe impairments.  In addition, substantial evidence supports the ALJ's finding that Elliott retained the RFC for a wide range of light work, and that mentally, she should avoid tasks that require sustained concentration, persistence, and pace for prolonged periods.   This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting

*Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*   Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight

to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule

provides that "adjudicators must weigh medical source statements under the rules set out in 20

C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician

can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

§ 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v.*

*Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the

Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in

administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical

records and testimony, and that his determination reflects those findings accurately.  The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to the opinions

of the medical sources.  The ALJ wrote:

> The claimant testified that she is unable to work due to a combination of physical and mental limitations.  She alleged her blood pressure and diabetes are not under control.  The claimant further alleged that she has adverse side effects from medication, including nausea, diarrhea, and headaches.  Due to her physical limitations, the claimant stated she could not walk more than 50 steps before needing to rest.  She also stated that she could only stand about 10 minutes, lift and carry five pounds, and had problems with bending, stooping, reaching overhead, or climbing stairs.  Mentally, the claimant stated that she cries all the time, has a poor memory, and does not deal well with stress or crowds.

> The medical evidence supports some of the claimant's allegations regarding her medical condition. However, for the reasons stated below, the undersigned finds that most of the claimant's allegations regarding the severity of her symptoms and functional limitations are not consistent with the record.

The evidence confirms that the claimant has diabetes and high blood pressure for which she has been prescribed medication. Medical records from Harris County Hospital District document that the claimant has occasional episodes of elevated blood pressure or blood sugar levels, which are resolved with treatment and medication. However, these records do not document any significant signs of diabetic retinopathy or neuropathy, sensory or reflex deficits, disturbances in the claimant's gait or station, or signs of muscle weakness or atrophy (Exhibit 11F). In April 2004, Alan Cororve, M.D., examined the claimant and took note of her self-reported high blood pressure and blood sugar levels. However, Dr. Cororve questioned the accuracy of the readings obtained by the claimant because of the discrepancy between the claimant's description of her symptoms and his clinical findings. On clinical examination, he observed that the claimant had normal strength and full range of motion, as well as a steady gait with no limp. (Exhibit 7F).

These clinical signs, findings, and medical opinions confirm that the claimant has both diabetes and high blood pressure. However, there is no objective evidence showing that the claimant's physical impairments have placed marked restrictions on her functioning, such as her ability to sit, stand, walk, or lift or carry at least light weights.

In addition to her physical impairments, the evidence documents that the claimant has a history of depression. In November 2003, Amina Abdulla, M.D., examined the claimant and confirmed the diagnosis of depression. She stated the claimant endorsed symptoms of depression, including crying spells, decreased energy, anhedonia, and feelings of helplessness and hopelessness. Despite her depression, Dr. Abdulla stated the claimant's thought process and memory were good, and that she demonstrated that she could complete tasks in a timely manner. Dr. Abdulla further stated that the claimant was able to care for her personal needs, although she relied on family members to perform most household chores. (Exhibit 3F).

Dr. Abdulla's findings and opinions are not inconsistent with treatment notes from Harris County Mental Health Retardation Authority (MHMRA). These treatment records document that the claimant has complained of depressive symptoms, such as a sad mood, hopelessness, sleep disturbance, and crying spells. Yet, these records also indicate that the claimant has reported she was doing fairly well and that her symptoms were responding well to medication with no adverse side effects (see, for example, Exhibit 13F, pages 13-14). In the most recent MHMRA record, dated January 19, 2005, the claimant's attending physician indicated that the claimant was asymptomatic, her medication response was full, and that she had no overall side effects. In addition, improvements were noted in the severity [of] the claimant's alleged depressive symptoms. (*Id*. pages 3-4).

None of the medical sources who have treated or examined the claimant for her depression have placed any restrictions on her ability to sustain gainful activity. In fact, Theodore Pearlman, M.D., a psychiatrist who examined the claimant in April

2004, questioned whether the claimant's mental limitations were as debilitating as alleged.  He stated there was a significant discrepancy between the claimant's allegations that she cried all the time and her presentation at the psychiatric evaluation.  He also found incredulous the claimant's responses during some of the clinical testing regarding memory, serial sevens, and insight and judgment.  These discrepancies were so pronounced that Dr. Pearlman was unwilling to diagnose the claimant with anything more than a fictitious disorder (Exhibit 6F).

Despite Dr. Pearlman's findings and opinions, the undersigned gives greater weight to the treatment records from MHMRA which concede that the claimant has a valid depressive disorder.  Nevertheless, all of the objective evidence, including the MHMRA records, show that the claimant's depression is not as debilitating as alleged.  Functionally, the claimant's mental disorder causes her to have only mild restrictions in her ability to perform activities of daily living, mild limitations in maintaining social interaction, moderate deficiencies in concentration, persistence and pace, and has not resulted in any repeated episodes of decompensation of extended duration.  (Tr. 20-21).

None of the medical opinions submitted support the conclusion that Elliott was disabled as a result of depression, diabetes and hypertension.  The ALJ did not err in his assessment of the medical opinions.  To the extent Elliott argues that the ALJ erred by not specifically mentioning Dr. Sadre's name and the weight he gave to Dr. Sadre's opinion, the ALJ while not elaborating in great detail the weight given to particular records, made clear, nonetheless, that he gave more weight to the opinions rendered by Elliott's examining, treating physician's at MHMRA (namely Dr. Sadre) and by Dr. Abdulla, an examining, non-treating physician than he did to the opinion proffered by Dr. Pearlman.  Any error in not mentioning Dr. Sadre by name was therefore harmless.  As to Elliott's contention that she was disabled as a result of depression, the medical records show that Elliott's depression responded to medication, and the ALJ took into account Elliott's testimony about her poor memory when he found that Elliott was limited as to her ability to perform work requiring concentration, persistence and pace, and included such a limitation in her RFC.  In light of the medical records submitted, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Elliott testified about her condition. According to Elliott, "I don't do anything.  I just sit around in my room, or I'll lay down, and go to sleep.  I don't do anything." (Tr. 427).  Elliott further testified that she has no hobbies and does not visit friends or relatives. (Tr. 427).  Elliott, did however, testify that she attends a diabetic support group meeting. (Tr. 427).  According to Elliott, she avoids crowds.  (Tr. 436).  In addition, Elliott stated that she has problems with stress and is "always crying."  (Tr. 437).  Also, Elliott stated that she has to write everything down or she will

forget.  (Tr. 436).  With respect to eating, Elliott testified that she has a poor appetite and suffers

from nausea, and is limited to a no sugar diet.  (Tr. 428).  Also, Elliott testified that her blood

pressure is not  under control and as a result, she has headaches.  (Tr. 429).  Similarly, Elliott

testified her blood sugar is not under control.  (Tr. 434).  Also, Elliott testified that she takes aspirin

for her heart murmur.  (Tr. 430).  As to her depression, Elliot testified that 20 mg of Lexapro is

"helping me" but that she still cries for no reason, is nervous and feels sorry for herself."  (Tr. 431).

Elliott estimated she could walk approximately 50 steps, could stand 5 to 10 minutes, could sit for

an hour, and could lift 5 pounds.  (Tr. 434-436).  Further, Elliott testified she would have trouble

with stairs, reaching overhead and bending.  (Tr. 435).  Based on the reasons which follow, the ALJ

rejected Elliott's testimony as not fully credible:

> Before determining the claimant's residual functional capacity, the Act and
> Regulations require that the Administrative Law Judge recognize that subjective
> symptoms of pain or another problem can be the basis of disability.  Once there is a
> medical impairment that can cause some pain (a medical nexus), it must be
> recognized that the impairment could produce disabling pain or other limitation (20
> CFR 416.929 and Social Security Ruling 96-7p).  Such factors as the claimant's work
> record, the observations of physicians and third parties, the claimant's daily activities,
> the duration, frequency, and intensity of her symptoms, precipitating and aggravating
> factors, her medications and use of medical treatment other than medications, her
> other attempts to obtain relief, and her functional restrictions must all be carefully
> considered.
>
> The undersigned concedes that the claimant has medically determinable impairments
> that can cause some pain and functional limitations.  However, the claimant's
> testimony is inconsistent and conflicts with other evidence of record, including her
> own previous statements to others.  The claimant's credibility is undermined by her
> statements and actions to Dr. Pearlman during his examination of the claimant in
> April 2004.  Dr. Pearlman thought her responses to some questions were factitious
> and inconsistent with her presentation.  Her credibility is further undermined by the
> fact that none of her attending or treating physicians observed physical restrictions
> or symptoms to the extent alleged by the claimant.
>
> Due to these inconsistencies and conflicts between the claimant's testimony and the
> other evidence of record, the undersigned finds that claimant's testimony is not fully

credible to the extent alleged.  Instead great weight is given the objective medical
evidence in determining the claimant's residual functional capacity.  (Tr. 21-22).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper
credibility findings, or that he weighed the testimony improperly.  Based on this record, there are
significant inconsistencies between Elliott's subjective complaints and the objective medical
evidence.  The ALJ identified the inconsistencies and gave specific reasons for rejecting Elliott's
subjective complaints, such as discrepancies in her statements in light of the medical evidence and
the lack of medical evidence to support her subjective symptoms.  For example, Elliott testified that
both her diabetes and hypertension were uncontrolled.  The medical records refute this.  Moreover,
the objective medical records, including those of her treating physician show that Elliott's depression
responded to medication and indeed, she repeatedly reported to her mental health care provider that
she was feeling better.  Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and
present age.  A claimant will be determined to be under disability only if the claimant's physical or
mental impairments are of such severity that she is not only unable to do her previous work, but
cannot, considering her age, education and work experience, engage in any other kind of substantial
gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Elliott, at the time of the hearing,  was forty-six years old, and had
completed high school.   The ALJ questioned Karen Nielsen, Ph.D., a vocational expert ("VE"), at
the hearing about Elliott's ability to engage in gainful work activities.  "A vocational expert is called
to testify because of his familiarity with job requirements and working conditions.  'The value of a
vocational expert is that he is familiar with the specific requirements of a particular occupation,

including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical question to the VE:

Q.  I'm next going to ask you a series of hypothetical questions.  And in responding to those questions, I would like for you to take into consideration someone of Ms. Elliott's age, educational and vocational background that you previously described.  For purposes of the first hypothetical question, let me ask you to assume an individual limited exertionally to the performance of no more than light work as defined by the *Department of Labor* and reflected in the Social Security Administration's regulations.  Assume further that I would find that this person would be precluded from performing work that would require sustained concentration and attention and persistence and pace for prolonged periods of time.  Assuming all of those limitations, but no others, for purposes of this first hypothetical question.  First of all, could  a person so limited perform any of Ms. Elliott's past relevant work, either as actually performed by her or as normally performed in the national and local economies?

A.  No, your Honor.

A.  Continuing to assume those limitations but not others, do you know of other work in the national or local economies that could be performed by someone of Ms. Elliott's age, education and vocational background, who was so limited.?

A.  Yes.  That hypothetical would put the individual at the sedentary unskilled level.  And a representative sample of those might be again a final assembler, which would be sedentary, unskilled.  A file inspector which is sedentary unskilled, and a laminator I, which is sedentary, unskilled.  And there is in excess of 1,000 of each

one of these jobs which are representative samples in Harris County, and the four surrounding counties.

Q.  Ma'am, you've been present during Ms. Elliott's testimony, you've heard the testimony that she has given today concerning limitations on prolonged standing and walking.  The limitation on lifting to weights to five pounds or more.  Also her testimony concerning frequent crying episodes, social withdrawal, remaining in bed for extended periods of time during the day.  If I find the testimony fully true and credible.  And find that she does experience all of the limitations reflected–

A.  Uh-huh.

Q.  — in her testimony?  Under those circumstances, do you know of work in the national or local economies that could be performed by someone of her age, education and vocational background who was so limited?

A.  No.  I believe that it would go in all competitive employment.  (Tr. 442-443).

The record further shows that Elliott's attorney declined to pose a hypothetical question to the VE.

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Elliott was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Elliott could perform a wide range of light work, avoiding tasks that require sustained concentration, persistence and pace for prolonged periods.  The ALJ did not err, as alleged by Ellliott, by not considering whether Elliott, once employed, could sustain and maintain employment.  The Fifth Circuit in *Perez v. Barnhart*, 415 F.3d 457 (5th Cir. 2005) reiterated that the ALJ is *not* required to determine whether the claimant's impairments prevent her from obtaining employment *and* whether the claimant will be able to maintain employment.  The Fifth Circuit wrote:

This court made clear in *Frank* [ *v. Barnhart*, 326 F.3d 618 (5th Cir. 2003)] that "nothing in *Watson* [*v. Barnhart*, 288 F.3d 212 (5th Cir. 2002)] suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain

employment in every case." *Id*. Rather, *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." Without such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination. *See Id.* at 465.

In the instant action, because Elliott's impairments were not of such a nature that wax and wane, Elliott's ability to maintain employment had been subsumed in the RFC determination and there was no obligation on the part of the ALJ to make specific findings regarding Elliott's ability to maintain employment. *See Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003) (inherent in the determination of RFC is the understanding that the claimant can maintain work at the level of the RFC). The regulations generally require the ALJ to perform the function by function analysis only with regard to strength demands, not non-exertional limitations, such as mental limitations. *See* 20 C.F.R. § 416.945. Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Elliott was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

**V. Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Elliott was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 26), is DENIED,

Defendant's Motion for Summary Judgment (Document No. 27) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 7th day of February, 2007

Frances H. Stacy
United States Magistrate Judge